# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 24-CV-00797 (RER) (PCG)

———————————

JENNIFER SENDEROWITZ,

VERSUS

HEBREW ACADEMY FOR SPECIAL CHILDREN,
THERAPEUTIC SERVICES, INC., AND
NAOMI GOLDZWEIG

———————————

**MEMORANDUM & ORDER**

———————————

**RAMÓN E. REYES, JR., District Judge:**

Plaintiff Jennifer Senderowitz worked at Hebrew Academy for Special Children from September 1, 2013, to July 8, 2021. Defendant Naomi Goldzweig was her direct supervisor, and they were in an intimate sexual relationship from 2014 to 2019. Plaintiff alleges that throughout the course of her relationship with Goldzweig and after it ended, Defendants discriminated against her based on her religion, gender, and sexuality. Plaintiff also alleges that Defendants misclassified her employee status, depriving her of overtime pay and other benefits. Plaintiff brings suit under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C §§ 2000e *et seq.*; New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296; New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107; the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*; New York Labor Law ("NYLL"), N.Y. Lab. Law § 195(3); and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Defendants move to dismiss all claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing they are either

inadequately pleaded or time-barred. After carefully reviewing the record, and for the reasons set forth herein, Defendants' motions are GRANTED in part and DENIED in part.

**BACKGROUND**[1]

I.     Factual Background

On August 8, 2013, plaintiff Jennifer Senderowitz ("Plaintiff" or "Senderowitz") and defendant Hebrew Academy for Special Children ("HASC") entered into an employment agreement titled "Clinician Independent Contractor Agreement." (ECF No. 30-3, Ex. B ("Cont.") at 2). She was paid biweekly by defendant Therapeutic Services, Inc. ("TSI"). (ECF No. 14, ("Am. Compl.") ¶ 19). Defendant Naomi Goldzweig ("Goldzweig," and collectively with HASC and TSI, "Defendants") was Plaintiff's direct supervisor throughout Plaintiff's employment with HASC. (Am. Compl. ¶ 30). Within roughly a year of employment, Senderowitz was promoted twice. (*Id.* ¶ 27). After her second promotion, Defendants allegedly "warned" Senderowitz to not tell anyone from "the state" of her new position since the position belonged to someone else on paper. (*Id.* ¶ 28).

After that second promotion, Goldzweig allegedly began inviting Senderowitz to social gatherings outside of work, including at Goldzweig's home. (*Id.* ¶ 31). During these interactions, Senderowitz alleges that Goldzweig asked her about her "lifestyle", specifically her friends' "sexuality and sex life." (*Id.* ¶ 33). Plaintiff identifies as not straight and as Jewish, but not Orthodox. (*Id.* ¶ 11). In the summer of 2014, Goldzweig and Senderowitz began an "intimate, sexual relationship." (*Id.* ¶ 34). They maintained this

---

[1] The Court acknowledges and offers its deep gratitude to Alicia Mayo, a judicial intern and third-year law student at St. John's University School of Law, for her assistance in researching and drafting this memorandum and order.

relationship from 2014 to 2019, during which Goldzweig never disclosed it to HASC's human resources department nor to TSI. (*Id.* ¶¶ 35–36).

Plaintiff alleges that on September 19, 2018, Goldzweig told her "she prayed for Plaintiff on Yom Kippur so that Plaintiff could 'get her head on straight,'" referring to her sexual orientation (*Id.* ¶¶ 38–39). Goldzweig allegedly raised her voice at Plaintiff in the workplace, made "disrespectful" comments about her in front of their colleagues, "slammed" Plaintiff's office door when entering and exiting her office, blocked Plaintiff from leaving "hostile situations" in the workplace, and slapped Plaintiff across the face multiple times in and out of the office. (*Id.* ¶ 40). When Senderowitz expressed a desire to end the romantic relationship, she alleges Goldzweig "screamed" at her and called her a "louse," "mean," "rotten," and "pig." (*Id.* ¶ 42).

On February 10, 2019, after the relationship ended, Goldzweig asked Senderowitz if she was "picking up girls" and whether Senderowitz met anyone better than her. (*Id.* ¶ 46). In July 2019, Plaintiff "repeatedly" told Goldzweig that she did not wish to continue their relationship and Goldzweig continued to call Senderowitz a "pig," "disgusting rat," and "fucking pig." (*Id.* ¶¶ 49–50). Goldzweig also "constantly" berated the LGBTQIA community in front of Senderowitz. (*Id.* ¶¶ 52–53). In or around fall 2019, Senderowitz alleges that Goldzweig asked to see pictures of the women Senderowitz dated and asked whether she went to lesbian bars. (*Id.* ¶¶ 54–55, 57). When Senderowitz did not respond, Goldzweig brought up work-related matters as a pretext for conversation. (*Id.* ¶ 58).

Around January 2020, Senderowitz alleges Goldzweig began "negatively fixating" on her work performance without providing details on what she was unhappy with or how

Senderowitz could improve. (*Id.* ¶ 59). In response, Senderowitz told Goldzweig she would file a complaint with HASC's human resources. (*Id.* ¶ 60). Goldzweig told her not to do so because nobody "would believe [Plaintiff]". (*Id.* ¶ 60). Senderowitz also alleges that Goldzweig refused to sign her billing, preventing her from getting paid. (*Id.* ¶ 61).

A month later, to "mitigate" the fallout, Senderowitz explained to Goldzweig that she was dating another woman. (*Id.* ¶ 62). In response, Defendant texted Senderowitz, "you really are a lesbian," and told Senderowitz that she was supposed to be with a man. (*Id.* ¶ 63). Goldzweig also accused Senderowitz of being "nasty." (*Id.* ¶ 64). Goldzweig "forced" Senderowitz to have conversations about her sex life and made sexual advances by asking to have sex with her and expressing a desire to touch her. (*Id.* ¶ 65). In one conversation, Goldzweig asked Plaintiff who was the "man" and had the "penis" in Plaintiff's relationship and then talked about Goldzweig and Plaintiff's previous sexual relationship. (*Id.* ¶ 71). Goldzweig also texted Senderowitz, "I have the hots [sic] for you, I am so wet," and "can't help my feelings, have had them [sic] for years." (*Id.* ¶ 67).

Goldzweig then demanded to know whether Senderowitz's new romantic partner was Jewish and expressed disapproval when she learned the new partner was not. (*Id.* ¶¶ 69–70). Goldzweig also disapproved of Senderowitz celebrating non-Jewish holidays and eating non-Kosher food. (*Id.* ¶ 70). She also told Senderowitz, "I wish we didn't work together . . . things will keep going south until you leave." (*Id.* ¶ 72).

In March 2020, Goldzweig allegedly outed Senderowitz as a lesbian to the entire office, spreading rumors about where she lived and who she was dating. (*Id.* ¶ 74). This prompted colleagues to ask Senderowitz about her dating life, where she lived, and who she was living with—questions they had never asked her before and did not ask of

heterosexual, Jewish Orthodox employees. (*Id.* ¶ 76). After the outing, Senderowitz alleges that Goldzweig still privately contacted her to get back together. (*Id.* ¶ 77). Rather than address the problem, HASC believed Goldzweig and Senderowitz were simply "fighting like an old married couple." (*Id.* ¶ 75).

Around mid-April 2020, Senderowitz accepted Goldzweig's invitation to a Passover Seder because she was "nervous" about the potential work-related ramifications of rejecting the offer. (*Id.* ¶ 78). Afterwards, Goldzweig allegedly pressured Senderowitz to have sex, which they did. (*Id.* ¶ 79). Senderowitz later expressed to Goldzweig that what happened was unacceptable and that they would never have sex again. (*Id.*)

Nevertheless, Goldzweig continued to comment on Senderowitz's personal life throughout the summer of 2020. On May 23, 2020, Goldzweig said she was upset that Plaintiff's new girlfriend was not Jewish (*Id.* ¶ 83). The next day, Goldzweig told Plaintiff to go with the "goyim" (a term she used to negatively refer to people who are not Jewish) to eat non-kosher food, and celebrate holidays. (*Id.* ¶ 84). A day later, she made another comment about Senderowitz not keeping kosher, and the next month, expressed concern that Senderowitz would be mixed up in the "goyish" world. (*Id.* ¶¶ 85–86). The comments instructing Senderowitz to eat kosher food continued, and Goldzweig allegedly did not make these comments to Orthodox Jewish employees and heterosexual employees. (*Id.* ¶ 87).

In February 2021, Goldzweig told Senderowitz that she was doing a good job and apologized for "mixing personal and professional." (*Id.* ¶ 88). Then, in March 2021, Goldzweig stated that Senderowitz was not a team player and should work somewhere

else. (*Id.* ¶ 89). In another comment to Senderowitz, Goldzweig characterized her as hostile and difficult to work with and told her that it didn't matter what anyone else thought because Goldzweig was "the boss" and the top of HASC's supervisory hierarchy. (*Id.* ¶ 90). A month later, Senderowitz informed HASC's school psychologist about these ongoing issues, but the psychologist did nothing in response. (*Id.* ¶ 97–98).

On June 1, 2021, Senderowitz told Goldzweig that she would leave work if Goldzweig continued her behavior because it was going to cause her mental breakdown. (*Id.* ¶ 100). When Senderowitz said she would file legal claims, Goldzweig threatened to sue Senderowitz for defamation. (*Id.* ¶ 101). Senderowitz pleaded with Goldzweig to simply treat her professionally, as she did others at HASC. (*Id.*) Then, on June 24, 2021, after Goldzweig heard that Senderowitz may not work at HASC that coming summer, she told Senderowitz she "better not 'screw [ Goldzweig].'" (*Id.* ¶ 102).

A week later, on July 1, 2021, Goldzweig walked into Senderowitz's office and noticed a decorative box on her shelf. (*Id.* ¶ 103). Goldzweig asked where she got it, and when Senderowitz did not answer, stated "Oh, your new girlfriend [got that for you]? Then she doesn't know the real you," and walked out, slamming the door. (*Id.*) Later that day, Goldzweig advised Senderowitz to give up her job if she didn't accept what Goldzweig "needed." (*Id.* ¶ 104). Plaintiff understood this to be a threat to her employment if she did not accept Goldzweig's sexual advances and harassment. (*Id.*)

On July 8, 2021, Senderowitz told Goldzweig she was leaving work at 3:00 P.M. for an appointment and confirmed she had completed all twelve hours of her supervision for the week. (*Id.* ¶ 107). Goldzweig told her that she needed to stay in the office even if she was not being paid for the time. (*Id.*) Senderowitz returned to her office and began

packing her things to leave. (*Id.* ¶ 109). Goldzweig asked why she was leaving, what her intentions were, and whether she was going to tell "people" about their sexual relationship. (*Id.* ¶ 110). HASC's Human Resources Associate Cheryl Follman ("Follman"), a neighbor of and regular visitor to Goldzweig's home, entered Senderowitz's office to inquire what was happening. (*Id.* ¶¶ 111, 114).

During the July 8 conversation, Follman expressed that Senderowitz was a "beloved employee," "very good at her job," and "valued by staff and children." (*Id.* ¶ 111). Plaintiff informed Follman that Goldzweig called Plaintiff a "bitch" and "pig" daily. (*Id.* ¶ 112). Follman recommended that Senderowitz take the weekend to reconsider any decision to leave HASC and suggested that Goldzweig might be having a bad day. (*Id.*) Senderowitz explained that Goldzweig's treatment had been ongoing for five years. (*Id.* ¶ 113). Follman did not investigate Senderowitz's allegations of discrimination and harassment. (*Id.* ¶ 117). On or after July 8, Senderowitz was locked out of her HASC email and could not access her work files. (*Id.* ¶ 118). Follman sent her the files so Senderowitz could finish her reports but did not re-open access to her HASC email account. (*Id.*)

After July 8, 2021, Goldzweig reached out to Plaintiff multiple times on Plaintiff's personal phone to say she didn't want Plaintiff to be terminated, that Plaintiff would be missed at work, and asked why Plaintiff left work. (*Id.* ¶¶ 119–20). On July 29, 2021, Goldzweig asked if Senderowitz was home, went to Senderowitz's house after she didn't respond, and "left things" by her door. (*Id.* ¶ 121). The last time Goldzweig reached out to Senderowitz was on March 8, 2022. (*Id.* ¶ 122).

Throughout this timeline, HASC reduced Senderowitz's hours but allegedly expected her to do at least the same level of supervisory work despite the pay cut. (*Id.* ¶¶ 91, 93). Senderowitz alleges she received wage statements that only provided the amount of money on her check but did not include the dates of work covered by that payment, name of the employer, rate of payment and basis thereof, or other required information. (*Id.* ¶ 95). Goldzweig sometimes "fought for [Plaintiff] to be paid fairly," but only when she and Plaintiff were on "good terms." (*Id.* ¶ 92).

In response to these ongoing incidents, Senderowitz suffered from anxiety, panic attacks, insomnia, depression, exhaustion, feelings of worthlessness, and a feeling that it "would be easier to die" than to endure such a work environment. (*Id.* ¶ 105, 109).

II.   <u>Procedural History</u>

On May 2, 2022, Plaintiff filed a charge of discrimination against HASC and TSI with the U.S. Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 7). The EEOC issued a right to sue letter on or about July 19, 2023. (*Id.*) On December 5, 2023, Plaintiff filed her initial complaint in New York State Court. *See generally* (ECF No. 1-4, Ex. D). Defendants removed the case to this Court. (ECF No. 1). On March 26, 2024, Plaintiff filed an amended complaint. (Am. Compl.). On November 18, 2024, HASC and Goldzweig, and then TSI, filed their respective motions to dismiss. (ECF No. 30 ("HASC Mem."); ECF No. 33-1 ("TSI Mem.")). Plaintiff opposed both motions (ECF No. 31 ("Pl.'s Opp'n HASC"); ECF No. 34 ("Pl.'s Opp'n TSI), and Defendants replied (ECF No. 32 ("HASC Reply"); ECF. No. 35 ("TSI Reply")).

## **LEGAL STANDARD**

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007); *see also Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985) ("[T]he Court's function is . . . to merely determine whether the complaint itself is legally sufficient."). However, "fact-specific questions cannot be resolved on the pleadings." *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022) (citation modified). A claim is factually plausible when it allows the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facts alleged in the complaint are assumed true for the purposes of deciding a motion to dismiss pursuant to Rule 12(b)(6), *Id.* at 678–79, and a court must "draw all reasonable inferences in favor of the plaintiff," *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

In assessing the sufficiency of a complaint, a court may consider documents incorporated by reference and documents that are "integral" to the complaint. *Di Folco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). To consider documentary evidence as "integral" on a motion to dismiss, it must be clear on the record that no material dispute exists regarding the document's authenticity, accuracy, and relevance. *Id.* Ultimately, a prerequisite is a plaintiff's reliance on the "terms and effect" of a document in drafting the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

## **DISCUSSION**

I.     Plaintiff's FLSA "Misclassification" Claim Is Dismissed

In her sixth cause of action, Senderowitz asserts a claim for "Misclassification in Violation" of the FLSA. (Am. Compl. ¶¶ 159–62). There is, however, no independent FLSA claim for "misclassification" separate from a claim for violation of the other benefits FLSA provides—*e.g.*, compensated overtime pay. *See* 29 U.S.C. § 207(a)(1). In other words, even if a plaintiff could prove that she was misclassified as exempt, she could not recover under the FLSA unless she established some other FLSA violation. The only allegation of an FLSA violation the Court can glean from the Amended Complaint is for unpaid overtime compensation. (Am. Compl., ¶ 94 ("Furthermore, Plaintiff frequently worked more than forty hours per week. However, she was only ever paid at her regular hourly rate for all hours worked.")).[2] To the extent Plaintiff claims a violation of the FLSA's overtime provision, her claim is inadequately pleaded and is dismissed.

"[I]n order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013). "Plaintiffs must provide sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that they worked more than forty hours in a given week." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723

---

[2] The FLSA requires employers whose employees work "longer than forty hours" in a workweek to compensate those employees "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Covered employees who are improperly denied overtime may sue to recover "unpaid overtime compensation" and "an additional equal amount as liquidated damages." Id. § 216(b); *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113-14 (2d Cir. 2023).

F.3d 192, 201 (2d Cir. 2013); *see also Kuck v. Planet Home Lending, LLC,* 354 F. Supp. 3d 162, 167 (E.D.N.Y. 2018); *Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 196 (E.D.N.Y. 2015). The Second Circuit has "taken care not to foreclose relief to plaintiffs who neglected to keep careful records" and does not necessarily require plaintiffs "to provide a week-by-week recounting of the hours they worked." *Herrera v. Comme des Garcons Ltd.*, 84 F.4th 110, 115 (2d Cir. 2023*); see also id.* at 114 (while a plaintiff "need not keep careful records of the number of hours worked each week or calculate and plead their hours with mathematical precision," it is insufficient to simply allege undefined overtime hours "in some or all workweeks." (quoting *Dejesus v. HF Mgmt. Servs.*, LLC, 726 F.3d 85, 90 (2d Cir. 2013))).

Senderowitz's allegation that she "frequently worked more than forty hours per week" (Am. Compl. ¶ 94) without specific supporting facts is the kind of conclusory allegation that fails to meet the pleading standard**.** *See Gomez v. Nat'l Fin. Network, Inc*., No. 20-CV-1968 (GRB) (AKT), 2021 WL 8084337, at *16 (E.D.N.Y. Aug. 2, 2021) (granting motion to dismiss because plaintiff did not allege specific hours worked, rate of pay, or one specific week of overtime work); *adopted by* 20-cv-01968 (Order dated 8/30/2021); *Spiteri v. Russo*, No. 12-CV-2780 (MKB) (RLM), 2013 WL 4806960, at *56 (E.D.N.Y. Sept. 7, 2013), (same) *aff'd sub nom. Spiteri v. Camacho*, 622 F. App'x 9 (2d Cir. 2015)**.** While Plaintiff explains that "Defendant HASC set a maximum number of hours that Plaintiff was able to be paid for performing supervisory duties" (*id.* ¶ 93), she does not specify the supervisory hour limit, nor how it relates to her overall hours worked. Even in her allegation that on July 8, 2021, Goldzweig demanded that she work unpaid hours after "she had completed *all 12 hours* of her supervision *for the week*" (*id.* ¶ 107)

(emphases added), there is no information about the total number of hours she worked that week. Senderowitz also suggests there may have been many weeks in which she worked fewer than forty hours, as "the allotted number of [supervisory] hours would fluctuate throughout the year." (*Id.* ¶ 93). "The specificity requirement is no minor hurdle," *Herrera*, 84 F.4th at 117–18, and Plaintiff does not clear it here.

Because Plaintiff fails to plead a plausible FLSA overtime claim with sufficient specificity, her FLSA claim is dismissed.[3]

II.    Plaintiff Lacks Standing to Assert A NYLL § 195(3) Claim

In her seventh cause of action, Senderowitz asserts a claim for statutory penalties for the failure to issue wage statements under NYLL section 195(3). (Am. Compl. ¶¶ 163–66). The NYLL requires employers to "furnish each employee with a statement with every payment of wages" that includes various, specified information. N.Y. Lab. Law § 195(3). After the Supreme Court's *TransUnion* decision,[4] the Second Circuit determined that plaintiffs cannot "rely on technical violations of the Labor Law but must allege actual injuries suffered as a result of the alleged . . . wage notice and wage statement violations." *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 305 (2d Cir. 2024) (citations omitted).

---

[3] Plaintiff's allegation that she was not paid at all for certain hours worked (Am. Compl. ¶ 107), are not covered by FLSA and better suited to state law breach of contract or NYLL claims, which she does not plead. *See Mackenzie v. Waypointe Partners Mgmt. LLC*, No. 22 Civ. 7951 (VSB), 2025 WL 388296, at *4 (S.D.N.Y. Feb. 4, 2025) ("Unlike the NYLL, which does cover unpaid-wage claims, the FLSA only covers claims for minimum wages and overtime wages. Plaintiff may not 'bring what is akin to a nonpayment or breach of contract claim' under the FLSA." (first citing *Nakahata*, 723 F.3d at 201–02, then citing *Barone v. Inspire Summits LLC*, 20-CV-5978 (NGG) (CLP), 2022 WL 3139124, at *2 (E.D.N.Y. Aug. 4, 2022))).

Because Plaintiff's FLSA claim is dismissed, the Court need not reach TSI's argument that Plaintiff fails to plead the existence of an employer-employee relationship under the FLSA. (TSI Mem. at 15–22).

[4] *Transunion v. Ramirez*, 594 U.S. 413, 426 (2021) (holding that a plaintiff does not automatically satisfy the injury-in-fact requirement simply because "a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.")

While a plaintiff need not show an injury greater than their unpaid wages, there must be "some causal connection between the lack of accurate notices and the downstream harm." *Id.* at 308–09. This may be satisfied by demonstrating that through its failure "to provide the required wage statements, the employer was able to hide [its] violations of wage and hour laws and thus prevent the employee from determining and seeking payment for the precise amount of [their] unpaid wages." *Roma v. David Carmili, Physician, P.C.*, No. 23-CV-4072 (KAM) (CLP), 2024 WL 5152211, at * 5 (E.D.N.Y. Dec. 18, 2024) (collecting cases). A plaintiff may also establish standing by showing they would have advocated for themselves and "avoided some actual harm or obtained some actual benefit if actual notices had been provided." *Guthrie*, 113 F.4th at 308 n.4 (citing *Metcalf v. TransPerfect Translations Int'l, Inc.*, No. 19 Civ. 10104 (ER) (KHP), 2023 WL 2674743, at *6 (S.D.N.Y. Mar. 29, 2023)); *see, e.g.*, *Roma*, 2024 WL 5152211, at * 5 (holding that defendants' failure to provide plaintiff with an accurate wage statement, which prevented her from verifying and correcting issues with her pay until years later, was an adequately alleged concrete injury).

Senderowitz argues Defendants failed to provide any wage statements in violation of section 195(3), and she was thus "materially harmed." (Am. Compl. ¶ 95). The Court might speculate that the "material harm" is her unpaid wages, but she neither specifies that harm nor makes a causal connection between a lack of accurate wage statements and any concrete injury in the form of unpaid wages or otherwise. Senderowitz certainly cannot argue that Defendants' failure to provide these statements prevented her from being aware of pay issues or advocating for herself, as she plainly asserts that both she and Goldzweig advocated for her to be "paid fairly" on numerous occasions. (Am. Compl.

¶¶ 92, 115). As noted, Plaintiff's allegations that she was not paid for hours worked on at least one occasion if not more are best suited to state law claims, but do not implicate NYLL section 195(3). Without the required harm and causal connection of the wage statement violations, Senderowitz lacks standing for wage statement violations under NYLL section 195(3), and these claims are dismissed.

III.     Plaintiff's ERISA Claims Are Untimely

In her eighth cause of action, Senderowitz asserts ERISA claims for her intentional misclassification as an "independent contractor" and the resulting denial of her participation in "retirement plans and other benefits comprised by ERISA that were offered to employees who were not misclassified as independent contractors." (Am. Compl. ¶ 168). The statute of limitation for ERISA claims is based on "the most nearly analogous state statute." *Perlman v. Gen. Elec.*, 2024 WL 4635235, at *1 (2d Cir. 2024) (quoting *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 104 (2013)). Though Plaintiff fails to identify which section of ERISA gives rise to her claim, her claim is most appropriately construed as one for benefits under ERISA section 502(a)(1)(B). *See Schulman v. Herbert E. Nass & Assocs. SEP IRA Plan*, No. 10 Civ, 9613 (RA), 2013 WL 4860119, at *3 (S.D.N.Y. Sept. 11, 2013) (analyzing a similar claim). The statute of limitations for such a claim is six years, accruing "upon a clear repudiation by the plan that is known, or should be known, to the plaintiff." *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Circ. 2008); *Costa v. Astoria Fed. S&L Ass'n*, 995 F. Supp. 2d 146, 152 (E.D.N.Y. 2014); *see also Schulman*, 2013 WL 4860119, at *4 ("For individuals who claim that they were misclassified, this repudiation occurs 'when the beneficiary first learns that she is considered an independent contractor and is therefore not entitled to benefit, regardless

of whether she later files a formal claim for benefits.'") (quoting *Brennan v. Metro. Life Ins. Co.*, 275 F. Supp. 2d 406, 409–10 (S.D.N.Y. 2003)).

Senderowitz did not attach her employment contracts with either defendant to her Amended Complaint. Nevertheless, a court may take such documents into consideration when deciding a motion to dismiss without converting the motion into one for summary judgment. *Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). Here, the contracts between Plaintiff and Defendants HASC and TSI are integral to the Amended Complaint because they rely on the "terms and effect" of the contracts as the basis for Plaintiff's misclassification claims. *See Id.* (holding an agreement as integral to the complaint because it heavily relied on a document's terms and effect).

Plaintiff knew or should have known that she would be denied participation in ERISA retirement or other benefits plans based on the terms of the employment contracts she signed. (*See* Cont. at 2). The six-year statute of limitations for her ERISA claims began to run when she signed the employment contracts in 2013. While Senderowitz claims that she did not learn of her misclassification upon hire (Pl.'s Opp'n HASC at 25–26), she does not provide a specific date when she learned that she was an "employee" instead of an independent contractor. Moreover, Plaintiff does not allege any additional benefits application nor attempt to change her status from independent contractor to employee. The employment contracts Plaintiff signed state she was hired as an independent contractor. (Cont. at 2). Plaintiff asserts she knew this from the outset (Am. Compl. ¶ 3; Pl.'s Opp'n HASC at 11–12), and she is bound by that admission. *See Brennan*, 275 F. Supp. 2d at 410 (S.D.N.Y. 2003) ("[I]t is undisputed that . . . plaintiffs

knew from their first day of work that they were working as freelancers and would not be entitled to benefits. Indeed, plaintiffs' assertion of this fact is a judicial admission by which they are bound."). While Senderowitz characterizes Defendants' inclusion of the initial contract as a "self-serving" selection (Pl.'s Opp'n HASC at 11; Pl.'s Opp'n TSI at 9), she does not claim she ever tried to renegotiate the terms or signed a contract with different terms.

The repudiation accrued in 2013, but Plaintiff failed to file her claim within the six-year statute of limitations. Thus, Plaintiff's ERISA claims are time-barred.

IV. <u>Plaintiff's Discrimination and Retaliation Claims Survive Dismissal</u>

Senderowitz claims that HASC and TSI subjected her to a hostile work environment and discriminated and retaliated against her in the terms and conditions of her employment because of her religion, sex, gender, and sexual orientation, in violation of Title VII (Am. Compl. ¶¶ 123–32), and that all defendants similarly violated NYSHRL and NYCHRL (*id.* ¶¶ 133–53). She also claims that Goldzweig is liable for aiding and abetting this discrimination under NYSHRL. (*Id.* ¶¶ 154–58).

TSI argues that it cannot be held liable for any of Senderowitz's discrimination or retaliation claims because she does not adequately plead that it was her employer within the meaning of the anti-discrimination laws (TSI Mem. at 10–14), or that she was an employee (*id.* at 18–22). Separately, HASC argues that all Senderowitz's discrimination and retaliation claims are untimely (HASC Mem. at 14–17) or inadequately pleaded (*id.* at 17–33). As discussed below, Defendants' arguments are rejected.

## A. Plaintiff Adequately Pleads TSI as a Joint Employer

TSI seeks dismissal of Plaintiff's discrimination and retaliation claims because she failed to allege the plausible existence of an employer-employee relationship. (TSI Mem. at 10–14). Plaintiff argues the determination of whether an employer-employee relationship existed should be reserved for summary judgement because of its fact-intensive nature. (Pl.'s Opp'n TSI at 9). Regardless, the Second Circuit makes clear that TSI's status as a formal or informal employer must be plausible. *See Felder v. U.S. Tennis Assoc.*, 27 F.4th 834, 838, 845 (2d Cir. 2022) (holding that a discrimination plaintiff must plausibly illustrate, not merely speculate, that parties contemplated an employer-employee relation that would permit liability). Plaintiff has adequately pleaded that TSI was her employer.

Employer liability exists against an entity that is not formally a plaintiff's employer if the "single employer" or "joint employer" doctrines apply. *Shiflett v. Scores Holding Co.*, 601 Fed. Appx. 28, 30 (2d Cir. 2015) (citing *Arculeo v. On-Site Sales & Mktg., LLC.*, 425 F.3d 193, 197 (2d Cir. 2005)). To determine whether two entities are a single employer courts examine "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.* (citing *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240-41 (2d Cir. 1995)). To evaluate whether a plaintiff is jointly employed by two employers, courts ask whether an alleged joint employer had "significant control over the terms and conditions of [Plaintiff's] employment." *Felder*, 27 F.4th 838. The Second Circuit identifies a joint employer as an informal employer which has the "power to pay an employee's salary, hire, fire, or otherwise control the employee's daily employment activities." *Id.* at 844.

Here, Senderowitz creates a plausible inference through at least four allegations. First, she alleges that TSI controlled her hiring, payroll, and billing. (Am. Compl. ¶ 19). *See Arculeo*, 425 F.3d at 198 (holding that the joint employer doctrine imposes employer liability on entities that "handle certain aspects on the employer-employee relationship jointly"); *see also Felder*, 27 F.4th at 837, 838–39 (establishing that examples of a joint employer exercising significant control are such employer's involvement in plaintiff's hiring, firing, promotion, training, supervising, handling of records and issuing paychecks). Second, Senderowitz alleges that her employment, per HASC's instructions, came through TSI. (Am. Compl. ¶ 15). Third, she alleges that TSI issued her paychecks biweekly, maintained Plaintiff's employment records, and set her rate of payment with HASC's input. (Am. Compl. ¶ 19). Fourth, Senderowitz alleges that TSI identified itself as her employer for insurance purposes. (*Id.*) Construing the evidence most favorably to Plaintiff, she sufficiently demonstrates that TSI hired her, TSI paid her with rates it determined while considering HASC input, and then HASC controlled her daily activities and hours. *Cf. Contra Toledo v. Brend Restoration Serv. Inc.*, No. 21 Civ. 882 (GBD) (SN), 2023 WL 3381249, at * 3 (S.D.N.Y. 2023) (dismissing plaintiff's discrimination claim because, even when construing the evidence in the light most favorable to plaintiff, the evidence showed that another entity hired her, that entity's co-owner paid her in cash each day, and that entity's foreman controlled plaintiff's daily activities). Thus, TSI can face liability on Plaintiff's discrimination and retaliation claims as her employer.[5]

---

[5] Because the Court finds Plaintiff has sufficiently pleaded employer liability under the joint employer doctrine, it need not reach TSI's argument regarding the failure to sufficiently plead liability under the single

## B. Plaintiff Adequately Pleads That She Was an Employee

The Second Circuit uses a two-part test to determine whether an individual is an employee, rather than an independent contractor, within the meaning of Title VII. *United States v. City of New York*, 359 F.3d 83, 91 (2d Cir. 2004) (citing *O'Connor v. Davis*, 126 F.3d 112, 115 (2d Cir.1997)). "First, the plaintiff must show she was hired by the putative employer" by establishing "that she received remuneration in some form for her work." *Id.* Then, a court looks to "the thirteen factors articulated by the Supreme Court . . . to determine whether an employment relationship exists."[6] *Id.* (citing *Eisenberg v. Advance Relocation and Storage, Inc.*, 237 F.3d 111, 113–14 (2d Cir.2000)). "In Title VII cases, the Second Circuit places the greatest emphasis on the extent to which the hiring party controls the manner and means by which the worker completes his or her assigned tasks." *Hassanein v. Gino's Italian Rest. on 5th*, No. 16-CV-3365 (AMD) (ST), 2017 WL 4350515, at *6 (E.D.N.Y. Mar. 27, 2017) (citation modified) (citing *New York*, 359 F.3d at 92). Even if an individual enters an agreement as an independent contractor, a court's assessment of these factors may still render them an employee under Title VII. *Eisenberg*, 237 F.3d at 115 (2d Cir. 2000).

---

employer doctrine. Plaintiff will, however, be permitted to engage in discovery on single employer liability.

[6] Derived from federal common law of agency, these include: "[1] the hiring party's right to control the manner and means by which the product is accomplished[;].... [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; [13] and the tax treatment of the hired party." *Hassanein v. Gino's Italian Rest. on 5th*, No. 16-CV-3365 (AMD) (ST), 2017 WL 4350515, at *6 (E.D.N.Y. Mar. 27, 2017) (citing *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751–52 (1989)).

For the same reasons that Senderowitz adequately pleads that TSI is her joint employer, she adequately pleads that she is TSI's employee. Her allegations that TSI controlled her hiring, payroll, and billing (Am. Compl. ¶ 19); was the actual employer, per HASC instructions (*id.* ¶ 15); issued her biweekly paychecks biweekly, maintained her employment records, and set her rate of payment with HASC's input (*id.* ¶ 19); and identified itself as her employer for insurance purposes (*id.*), together demonstrate that TSI was her putative employer and she received renumeration for her work from TSI. As explained above, HASC and TSI were plausibly Senderowitz's joint employers, jointly controlling the "manner and means" of her work. *Hassanein*, 2017 WL 4350515, at *6. Accordingly, Senderowitz was plausibly an employee of TSI.

### C. Plaintiff's Discrimination and Retaliation Claims Are Not Time-Barred

While admitting Plaintiff's allegation of being "constructively terminated" is timely, HASC nevertheless argues that *all* of Plaintiff's discrimination and retaliation claims, including her constructive discharge claim, are time-barred because she has "failed to plausibly allege constructive discharge as an adverse action [and] [a]bsent a timely adverse action [] Plaintiff's claims fail as a matter of law." (HASC Mem. at 14–15). The Court disagrees for two reasons.

First, Senderowitz *has* plausibly alleged a constructive discharge on July 8, 2021, (Am Compl. ¶¶ 105–18), and such a discharge constitutes an adverse employment action, *Notaro v. Fossil Indus., Inc.*, 820 F.Supp.2d 452, 459 (E.D.N.Y. 2011) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004)). Constructive discharge occurs when "an employer discriminates against an employee to the point such that [her] working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Shultz v. Congregation Shearith Israel of City of*

*N.Y.*, 867 F.3d 298, 308 (2d Cir. 2017) (quoting *Green v. Brennan*, 578 U.S. 547, 555 (2016)). A plaintiff must plausibly allege (1) "the employer's intent to create an intolerable environment that forces the employee to resign", and (2) that "a reasonable person would have found the work conditions so intolerable that [they] would have felt compelled to resign". *Id.* at 308. (quoting *Adams v. Festival Fun Parks, LLC*, 560 Fed. Appx. 47, 49 (2d Cir. 2014)).

Senderowitz plausibly alleges both elements, supported by the same set of facts. Goldzweig intended to create an intolerable environment where a reasonable person would have felt compelled to resign when she allegedly: frequently insulted Senderowitz in front of colleagues and outed her as a lesbian (Am. Compl. ¶¶ 40, 74); subjected her to unwelcomed, sexualized communication and petitions for sex when the two were no longer in a sexual relationship (*id.* ¶¶ 67, 79); made disparaging remarks to her about her sexuality and the LGBTQIA community (*id.* ¶¶ 38-39, 52); slapped Senderowitz at the workplace (*id.* ¶ 40); made derogatory comments about Senderowitz's religious practice (*id.* ¶¶ 70, 84, 86–87); periodically interfered or threatened to interfere with her compensation and negatively evaluated her work performance despite a successful track record (*id.* ¶¶ 59, 61); told Senderowitz she wished they didn't work together because "things will keep going south until you leave" (Am. Compl. ¶ 72); insisted Senderowitz accept her unwelcomed advances and harassment (what Goldzweig "needed"), or "give up" her job (*id.* ¶ 104); labeled Senderowitz as "difficult, disrespectful, and unapproachable" whenever she tried to resist harassment from or engagement with Goldzweig (*id.*); and directed Senderowitz to remain at work without being paid (*id.* ¶ 107).

A reasonable person is unlikely to tolerate such treatment, including working without pay. That directive plausibly served a "final straw," effectively forcing Senderowitz to either quit or consider quitting, as she went to pack her things and both Goldzweig and Follman asked why she was leaving. (*Id.* ¶ 107–12). These facts are sufficient at the pleading stage. *See Green v. Town of East Haven*, 952 F.3d 394, 405 (2d Cir. 2020) ("The fact that this substantive standard is an objective one, however, does not necessarily mean that what a reasonable person in the plaintiff's shoes would have felt compelled to do is determinable as a matter of law, for an objective question is often fact-specific."); *see also Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 162 (2d Cir. 1998) (holding that an employer deliberately created intolerable conditions where the plaintiff alleged that employer predicted that plaintiff would no longer be with the company weeks before plaintiff was informed of an "intolerable reduction" in payment).

Second—since Plaintiff plausibly alleges a constructive discharge claim within the limitations period, as explained below—she may anchor her other related allegations of discrimination, hostile work environment, or retaliation as timely, or at the very least, allege them as background to those claims.

To sue in federal court, Title VII claimants must first file charges of discrimination with the EEOC within 300 days of the alleged occurrence of an unlawful employment practice. 42 U.S.C.§ 2000e-5(e)(1); *Buon*, 65 F.4th at 77 (citing *Pikulin v. City Univ. of N.Y.*, 176 F.3d 598, 599 (2d Cir. 1999)). If the EEOC issues a right-to-sue letter, then claimants must file a related lawsuit within ninety days. 42 U.S.C. § 2000e–5(f)(1); *Tiberio v. Allergy Asthma Immunology of Rochester*, 664 F.3d 35, 37 (2d Cir. 2011). The continuing violations doctrine is a relevant exception to this limitation, and it applies so

long as one discriminatory act falls within the limitation period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002); *see also Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) ("[C]ontinuing violation may be found where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.") (citation modified). This "extends the limitation periods for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations." *Bright v. Coca Cola Refreshements* [sic] *USA, Inc.*, No. 12-CV-234 (BMC), 2014 WL 5587349, at *4 (E.D.N.Y. Nov. 3, 2014) (quoting *Annis v. Cnty. of Westchester*, 136 F.3d 239, 245–46 (2d Cir. 1988)), *aff'd*, 639 F. App'x 6 (2d Cir. 2015). The doctrine often applies to hostile work environment claims because they "comprise of a series of separate acts that collectively constitute one unlawful employment practice." *Anderson v. Nassau Cnty. Dep't of Corr.*, 558 F.Supp.2d 283, 297–98 (E.D.N.Y. 2008) (quoting *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130,134 (2d Cir. 2003)); *see also King v. Aramark Servs., Inc.*, 96 F.4th 546, 559-61 (2d Cir. 2024) (". . . a hostile environment is formed and shaped by an assemblage of discriminatory acts . . . ."). Furthermore, a plaintiff may "rely on her time-barred allegations of defendant's misconduct 'as background evidence in support of [her] timely [constructive discharge] claim.'" *Barker v. Aramark Unif. & Career Apparel*, LLC, No. 19-CV-2710 (PKC) (SMG), 2024 WL 4287242, at * 5 (E.D.N.Y. Sept. 25, 2024) (first quoting *Cummings v. Brookhaven Sci. Assocs., LLC*, No. 11-CV-1299 (DRH) (ETB), 2011 WL 6371753, at *14 (E.D.N.Y. Dec. 20, 2011), then citing *Morgan*, 536 U.S. at 113). Such background may include discrete and non-discrete acts so long as a single discriminatory act falls withing

the limitation period. *Sooroojballie v. Port Auth. of N.Y. & N.J.*, 816 Fed. Appx. 536, 543 (2d Cir. 2020).

Here, Senderowitz filed her EEOC charge on May 2, 2022, and received a right to sue letter on July 19, 2023. Plaintiff's July 8, 2021, constructive discharge is timely, as it occurred after July 6, 2021 (300 days prior to her EEOC charge). Senderowitz also alleges that Goldzweig called her a "bitch" and "pig" and other insults *daily*, which would include her last day, July 8, 2021, during their final altercation at HASC. (Am. Compl. ¶ 112). Thus, Goldzweig's otherwise untimely derogatory statements, gestures, physical contact, and other acts from 2013 to 2021 may form part of an ongoing discriminatory practice, rendering them timely under the continuing violations doctrine. *King*, 96 F.4th at 559–61. And even if these other acts could not be rendered timely, they provide "background evidence" in support of Senderowitz's timely constructive discharge claim. *Barker*, 2024 WL 4287242, at * 5.

D. <u>Plaintiff's Title VII Claims are Plausibly Alleged</u>

a. Discrimination Claims

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Buon v. Spindler*, 65 F.4th 64, 78 (2d Cir. 2023). At the motion to dismiss phase, a plaintiff must satisfy only two elements: "(1) the employer discriminated against the employee (2) because of his race, color, religion, sex, or national origin." *Buon*, 65 F.4th at 78 (citing *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015)). Under this framework, a plaintiff must show that they faced an adverse employment action and

allege "facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega,* 801 F.3d at 87. Such a showing "need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, at 311 (2d Cir. 2015). Showing that an employee outside of a plaintiff's protected group is similarly situated in "all material respects" and was treated more favorably than plaintiff is sufficient to give rise to an inference of discrimination. *Id*. at 312.

Goldzweig's actions, including the constructive discharge, plausibly suggest that Senderowitz's sexual orientation, gender, and religion were motivating factors because Goldzweig's comments were regularly riddled with negative references to Senderowitz's protected characteristics. *See Gordon v. APS Contractors Inc.*, No. 21-CV-259 (WFK) (JRC), 2024 WL 4029520, at *6 (E.D.N.Y. Feb. 20, 2024) (holding that a plaintiff sufficiently alleged an inference of discrimination where plaintiff's supervisor made a "bigoted comment" directed at plaintiff's protected class). Furthermore, Plaintiff's allegation that she was treated differently than her Orthodox Jewish, heterosexual colleagues in terms of the discriminatory behaviors and questions Goldzweig subjected her to on a daily basis, provide "'relevant background evidence' by shedding light on Defendant's motivation and thus bolster [her] claim that Defendants treated [her] differently because of" her sexual orientation, gender, and religion. *Vega*, 801 F.3d at 88 (quoting *Morgan*, 536 U.S. at 112).

Defendants HASC and Goldzweig also assert that there is no inference of discriminatory motive because the alleged discrimination arose from a failed relationship. (Mem. HASC at 26–27). But the fact that Senderowitz and Goldzweig ended an intimate

relationship that Goldzweig at times wanted to reinitiate does not, on its own, preclude an inference of discrimination. *See Stepheny v. Brooklyn Hebrew Sch. for Special Child.*, 356 F.Supp.2d 248, 263 (E.D.N.Y 2005) ("If the jilted lover seeks retribution through actions that are not gender- or race-based, Title VII is not implicated. If the conduct is gender- or race-based, it is."). Surely, some of Goldzweig's comments and actions arose from her frustrations about their failed relationship. But such feelings do not immunize a defendant from liability for discriminatory behavior that is facially neutral, let alone behavior that explicitly refers negatively to a plaintiff's sexual identity and religion. *Id.* Furthermore, Senderowitz proffers various facts—including disparaging comments about her sexual identity and religion, alongside physical abuse through slapping—that occurred before, during, and after their relationship. (Am. Compl. ¶¶ 36, 37, 40); *cf. Stepheny* at 263 (E.D.N.Y 2005) (holding that a defendant's use of "white bitch" did not infer race-based discrimination because defendant *only* used the non-neutral term in the context of failed and "frustrated amorous tryst" with a plaintiff). Goldzweig's comments were facially discriminatory and not tied exclusively to Senderowitz ending their intimate relationship. So, neither here can Defendants insulate themselves from liability simply because Senderowitz and Goldzweig were in an intimate relationship at some point. Goldzweig's facially discriminatory comments speak for themselves and cast their shadow even over her offensive, albeit facially neutral, words and actions.

b. Hostile Work Environment Claims

To sufficiently plead a hostile work environment claim, a plaintiff must plausibly allege that the conduct "(1) 'is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive'; (2) creates an

environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's [protected characteristic]. . . .'" *Amaya v. Ballyshear*, 295 F. Supp. 3d 204, 223–24 (E.D.N.Y. 2018) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)). An objectively hostile work environment plausibly exists when "the workplace is so permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Judkins v. Brooklyn Hosp. Ctr.*, No. 20-CV-6222 (LDH) (MMH), 2023 WL 2652279, at *2 (E.D.N.Y. Mar. 27, 2023) (quoting *Littlejohn*, 795 F.3d at 320–21; *see also Reynoso v. All Foods, Inc.*, 908 F. Supp. 2d 330, 339 (E.D.N.Y. 2012) ("In the context of a 12(b)(6) motion, a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment ... of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." (citation modified) (quoting *Patane*, 508 F.3d at 113)). "[C]ourts should examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (citation modified). Furthermore, "sex-based hostile work environment claims may be supported by facially sex-neutral incidents and 'sexually offensive' acts may be facially sex-neutral." *Id.* (citing *Alfano v. Costello*, 294 F.3d 365, 375 (2d Cir. 2002)).

There is no dispute that Senderowitz subjectively perceived her work environment at HASC to be hostile or abusive. The same facts that support her other Title VII claims—

including those captured by the continuing violations doctrine—extend to a plausible allegation that the environment was subjectively hostile or abusive. Senderowitz alleges that she was insulted on a constant, ongoing, daily basis with either facially neutral terms or derogatory comments about her sexuality and religious practice (Am. Compl. ¶¶ 38–39, 45, 49–50, 52–53, 65–67, 70–71, 73, 84, 86, 104, 109, 112, 122, 138). Physical abuse in the form of slapping, alongside outing her to other staff and threatening professional consequences if Senderowitz reported Goldzweig's abuse (*Id.* ¶¶ 40, 59–60, 90), only bolster her claim. Plaintiff alleges this harassment caused her to become nervous about her job security and feel she was "going to have a mental breakdown," and otherwise suffer serious anxiety, depression, exhaustion, and even suicidal thoughts. (*Id.* ¶¶ 59, 100, 105, 109). Taken as a whole, Senderowitz plausibly alleges that the abusive environment created by Goldzweig, and allegedly ignored by HASC and TSI, altered her working conditions and was not an environment a reasonable employee could tolerate.

### c. Retaliation Claims

Title VII prohibits discrimination against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a).To state a retaliation claim at this stage, under reduced prima facie standards, a plaintiff must plausibly allege "that (1) defendants discriminated or took an adverse action against [them], (2) because [they] has opposed any unlawful employment practice." *McKinnies v. City of New York*, 2024 WL 4333703, at *8 (E.D.N.Y. Sept. 27, 2024) (quoting *Vega*, 801 F.3d at 90); *see also Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 331 (S.D.N.Y. 2020) (citing *Duplan v. City of*

*New York*, 888 F.3d 612, 625 (2d Cir. 2018)). The adverse employment action in the retaliation context is one which "could well dissuade a reasonable worker from making or supporting a charge of discrimination," *Vega*, 801 F.3d at 90 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)), and must be "'materially adverse', meaning that it causes 'significant' harm," *Muldrow v. City of St. Louis* 601 U.S. 346, 348 (2024). (quoting *White*, 548 U.S. at 68); *see also Hinds v. PSEG Long Island LLC*, No. 23-CV-08701 (RER) (LGD), 2026 WL 266010, at *7 n.5 (E.D.N.Y. Feb. 2, 2026) (explaining Second Circuit courts' application of the *Muldrow* standard to discrimination and retaliation claims). Opposition to the adverse action is broadly defined and not limited to formal complaints, *Littlejohn*, 795 F.3d at 318, and "even without direct evidence of causation, 'a plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action,'" *Kwan v. Andalex Grp., LLC,* 737 F.3d 834, 845 (2d Cir. 2013) (alteration omitted).

As noted, Plaintiff plausibly alleges an adverse employment action through her constructive discharge. Being discharged would deter a reasonable employee from complaining about discrimination, and in fact, Senderowitz's background allegations demonstrate that Goldzweig's actions often did deter her from making formal complaints to others beyond her direct supervisor. (*Id.* ¶¶ 62–96, 102–05). Further, Goldzweig took each of these actions after Senderowitz complained to Goldzweig about her ongoing discriminatory harassment, and HASC terminated Senderowitz's access to her email and constructively discharged her after she complained to Follman about Goldzweig's discriminatory harassment. (*Id.* ¶ 118; Pl.'s Opp'n HASC at 22). Senderowitz therefore

adequately alleges that Defendants took these adverse actions in retaliation for her complaints to Goldzweig and Follman about unlawful discrimination.

Thus, Defendants' motions to dismiss Plaintiff's Title VII discrimination, hostile work environment, and retaliation claims are denied.

### E. Plaintiff's NYCHRL and NYSHRL Claims Shall Proceed

NYCHRL and NYSHRL both provide that an employer may not discriminate based on race, national origin, or disability, among other protected characteristics. N.Y. Exec. Law § 296; N.Y.C. Admin. Code § 8-107(1); *Cooper v. Franklin Templeton Inv.*, 2023 WL 3882977, at *2 (2d Cir. 2023) (citation omitted). Both laws also prohibit retaliation against an employee who has opposed their discrimination. N.Y. Exec. Law § 296 (7); N.Y.C. Admin. Code § 8–107(7). In both the discrimination and retaliation contexts, the State and City laws impose a more lenient standard. *Deveaux v. Sketchers USA, Inc.*, No. 19-CV-9734 (DLC), 2020 WL 1812741, at *5 (S.D.N.Y. Apr. 9, 2020) (clarifying that, rather than demonstrate an adverse employment action, a "plaintiff need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent") (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013)); *Bright*, 2014 WL 5587349, at *4 (explaining that NYSHRL and NYCHRL retaliation claims only require the plausible allegation that an employer's conduct is "reasonably likely to deter a person from engaging in protected activity") (quoting *Sotomayor v. City of New York*, 862 F.Supp.2d 226, 262 (E.D.N.Y. 2012)). Furthermore, "the reach of the continuous violation doctrine under NYCHRL is broader than either federal or state law," *Ctr. for Indep. of Disabled v. Metro. Transp. Auth.*, 125 N.Y.S.3d 697, 703 (1st Dep't 2020), where there is "a consistent pattern or a continuing policy of discriminatory or

retaliatory acts," *Gordon v. N.Y. City Transit Auth.*, No. 24-CV-3411 (JAM), 2024 WL 5217932, at *8 (E.D.N.Y. Dec. 26, 2024).

Because Senderowitz meets the higher standard under Title VII for her discrimination, hostile work environment, and retaliation claims, she sufficiently alleges such claims under New York State and City law as well. *See Styka v. My Merchants Servs. LLC*, No. 14-CV-6198 (ENV) (VMS), 2016 WL 3866550, at *2 (E.D.N.Y. July 13, 2016) ("A well-pled Title VII discrimination or retaliation claim is sufficient to support a corresponding claim under the NYSHRL, as well as under the NYCHRL, which provides even broader protection than its federal and state counterparts.").

Lastly, under NYSHRL, an individual is liable for unlawful discriminatory practice if they "aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [NYSHRL], or to attempt to do so." N.Y. Exec. Law § 296 (6). Senderowitz plausibly alleges such individual liability against Goldzweig.

HASC argues that Plaintiff's aider and abettor claim against Goldzweig fails because the claim is based solely on her own alleged conduct. (Mem. HASC at 30–31). However, courts in this Circuit differ on whether a defendant may be held liable for aiding and abetting allegedly unlawful discrimination by their employer even where her own actions serve as the predicate for the employer's vicarious liability. *Compare Conklin v. Cnty. of Suffolk*, 859 F.Supp.2d 415, 436 (E.D.N.Y. 2012) (holding that a defendant may be held liable for aiding and abetting allegedly unlawful discrimination by her employer even when her actions predicate the employer's vicarious liability, so long as the employer may be held liable) *with Boyce v. Weber*, No. 19 Civ. 3825 (JMF), 2020 WL 5209526, at *2 (S.D.N.Y. Sept. 1, 2020) ("Put simply, it is oxymoronic to say that an individual

defendant can aid and abet his own primary conduct."). The Second Circuit has yet to resolve this split. In that context, the Court declines to foreclose Plaintiff's opportunity to plead such a claim when courts in this district have allowed it, especially to prevent "lone wolf" bad actors from escaping liability because none of their co-workers individually committed discriminatory acts. *Johnson v. Cnty. of Nassau*, 82 F.Supp.3d 533, 537 (E.D.N.Y. 2015).

Accordingly, Plaintiff's third cause of action against HASC and TSI and her fifth cause of action against Goldzweig survive dismissal.

## CONCLUSION

For the reasons set forth above, the Court GRANTS in part and DENIES in part Defendants' motions to dismiss. Plaintiff's FLSA, NYLL, and ERISA claims are dismissed, while her discrimination, hostile work environment, and retaliation claims under Title VII against Defendants HASC and TSI, along with her NYCHRL and NYSHRL claims against all Defendants, may proceed.

SO ORDERED.


/s/ Ramón E. Reyes, Jr.

RAMÓN E. REYES, JR.
United States District Judge

Dated: February 17, 2026
        Brooklyn, New York